Judge Underwood
delivered the opinion of the Court.
Robert Poagujs recovered a judgment against Daniel Richardson, in 1813, for £6G9 8?. 3d. sued out a ca. sa. thereon, and committed him to jail. He escaped without paying the debt. Poague filed, his bill, in June, 1814,against Richardson, Boyce,&c. charging, that D. Richardson had fraudulently transferred his estate to Robert Boyce, his son-in-law, and to Stephen Richardson, his son, with the intent to defraud the complainant, by avoiding the payment of the doffi, wherefore he prayed relief, Sic. The circuit court dismissed the bill, and the complainant below prosecutes this writ of error.
The only matter of importance, which we deem it necessary to enquire into, relates to six slaves transferred by D. Richardson to R. Boyce, at the price of $1,800, for which the latter executed his note payable in three years, with interest to be annually paid. The bill charges the contract to be fraudulent,in regard to the complainant as a creditor; and prays, that the money due by Boyce to Richardson may be decreed to the complainant, in satisfaction, so far as it would go, of the judgment, or for “such other decree as the court may think right.”
Boyce denied all fraud charged upon him. He says he made the purchase in January, 1812, for $1,800, payable in three years, as already stated; and that, amongst other inducements, he made the purchase to prevent the slaves from being separated, as they had been raised in the family, “D. Richardson evincing a determination to sell them to some person.” That, “at the time he purchased, he had not the most distant expectation that the complainant would ever recover a judgment, as he had, before that time, been twice unsuccessful in the court below.” That, “at the time he made the purchase of the slaves, D. Richardson had a sufficiency of estate left to support himself and familv.” That, “shortly afterwards, D. Richardson became exceedingly prodigal5intemperate,and *71 inattentive to business, by which means he squandered and wasted his property, and became exceeding needful of most of the necessaries oflife; and, being thus reduced, he soon exhausted his claim to the interest on the bond before it was due; and made frequent calls on the defendant for-money and other articles; and he, the defendant, knowing the situation to which the said D. Richardson had reduced himself, by intemperance, &c. was induced to make him many advances before it was due to him.” That, “at length, said D. Richardson became so troublesome with his applications for money, that this defendant informed him, he had a large sum.due from Henry Hunt of the Mississippi Territory, and as soon as he could receive the money, he would pay the balance due on the note for $1,800. That this seemed (o satisfy D. Richardson; but shortly thereafter, said Daniel informed this defendant, that, if he would draw on said Hunt at a short day after sight, that he, Daniel, would accept the draft for the balance due on the note; accordingly, in the early part of the summer of 1814, this defendant gave such draft and took in his note.” That, on or about the 1st, 2d, or 3d day of November, 1814, said Daniel again applied to this delendant, and informed him he had not collected the money on the draft, nor had he made any application for payment to Hunt, and then solicited this defendant to take up the draft and pay the money himself, alleging his distressed situation; and this defendant knowing said Daniel tobeindigentand restless,and anticipating that be should be much pestered by him unless he acceded to the proposition, and that he should incur his lasting displeasure, (which he was unwilling to do, as he was his father-in law,) this defendant, under the iin-fluence of such considerations, and being desirous of getting clear of the demand, did, on or about the 1st, 2d, or 3d of November, 1814, take up süd draft, and pay said Daniel the full amount for which it was given, the particular amount of which he could not recollect, but it was upwards of $1,600; and he alleges, that the payment so made was made bona Jide^ and before notice of any subpoena or process in this case. This defendant assigned no bond or bonds to said Daniel, nor did he pay him in any manner different from what he has herein stated.”
*72 The foregoing is, in substance, 1 he auswer of Boyce, iih-*d to the oiiginal bill, so far as the slaves, and tiic payment of the money due for them, is concerned. At the next term after the. said answer was filed, the complainant amended his bill, and made Thomas Ken-nedv a party, arid charged a fraudulent combination between said Kennedy and Boyce. The. amendment allege?, in substance, that Boyce, in order to prevent the complana-mi from obtaining a decree against him. for the, $1,800, prete-'ded that he had paid Richardson, bi borrowing $1,078 from Kennedy; that the advance of tin* money t>\ Kenuedi was a snam; and that it: was understood, that it should be immediately returned to Kennedy in the absence of Boyce; and that Kennedy was to take the money home with him, under pretence that Richardson had deposited it with him for safe keeping. Numerous interrogatories were put to develope the transaction.
Kennedy, in his answer to the amendment, states Un t Stephen Richardson informed him, anout the 1st day in November, 1814, that Boyce was indebted to Daniel Richardson about $2,000, due and pay able the first oi the ensuing April; and that his father, said Daniel, was in great want of the money, arid had ap-pli-d to Boyce for payment, and that Boyce and the sa'i! Daniel had fallen out concerning it; and that Boyce stated to said Daniel, he had no money, but if said Daniel would procure any person to loan him the money, until April, 1815, he would borrow it and pay the debt. Said Stephen also informed this defendant, that he and said Huiiel (old Boyce, they had no doubt this defendant would loan the money; and he, said Stephen, agreed to call on the. defendant for the loan of the money ; and that said Stephen did, on said 1st of November, accordingly call on this delendant for the loan of the money. Tlie defendant told said Stephen ho had the money by him, and had no immediate use for it; and that he was going to Harrodsburg in a few days, and lie would Hiere see Boyce. Said Stephen desired the defendant to take die money down with him, and, if he should loan i>, Boyce would be saved the trouble of corning up to Garrard, where the defendant lived. The defendant took the money with him. He a>d said Step'-en we it to the house of Boyce, who lived in the neighborhood of Harrods- *73 liVirg; and when they got to Boyce's he found said Boyce at home, and the defendant Daniel was also there. Boyce told the defendant, if he could borrow the money he would do so, and pay Richardson, and give this defendant his note pay able the ensuing April. This defendant informed Boyce he could get the money for that time. The defendant produced the money. Daniel Richardson was called in by Boyce, who informed him that he could then pay him the money, and requested this defendant to count it on the table. When the money was counted, the said Boyce observed to said Daniel, that there was his money, and Boyce immediately executed his note to this defendant for $1,978. Daniel Richardson took the. money. This defendant loaned the money to accommodate Boyce. There was no agreement between them respecting interest. Boyce shortly before had made (his defendant a present of some sto< k, of a favorite breed, and had refused to receive any pay for the same, and this defendant supposed it would have been ungrateful him, to charge interest on the money for so short time. This defendant thinks the value of the stock equivalent to the interest of the money. Boyce was the friend and intimate of the defendant. On the same day the money was loaned, Richardson requested this defendant to take the money home to his house, and keep it for him until he called lor it; and stated, that he could get it from him at any time he might want it: that Boyce had treated him Ridly, and he was glad he had got the money out of his hands. ■'This defendant was induced to take the money for safe keeping, for the purpose of obliging the defendant Daniel, who is an aged, frail, and intemperate man, and not for the purpose oí defrauding the complainant, This defendant kept the money until 31st of August, 1815, when he paid itovorto Stephen. Richardson, in pursuance of the order of said Daniel, making the payment, in horses and money. This fendant denies that he had any notice, that the complainant was about to subject the debt due from Boyce to Richardson, to the payment of his demand, previous to lending the money to Boyce, anil denies all fraud imputed.
Boyce answered the supplemental bill, reiterating, with additions, the reasons which induced him to pur *74 chnse the slaves, and entering info a tedious detail ol'family affairs and arrangements,'from all which it that he wished to impress the idea, that he was morally bound to pay the debt, or part of it, to Richardson, before it became due. Boyce, in this answer, ñxes the time he gave Richardson the draft on Hunt of Mississippi, to be June, 1814. This answer states, that D. Richardson, for some months before Boyce gave the draft on Hunt, had become extremely clamorous against Boyce on account of the demand, giving it out in speeches, that Boyce had purchased his property and wrongfully detained the money, and that he, said Daniel, was suffering in his old age for the ordinary necessaries of life. According to this answer, tile said Daniel,about the 1st ofNov. 1814, became more clamorous than ever, although he had taken no steps whatever to collect the draft on Hunt, which he had accepted in June. He then charged Boyce with having gotten his property, and refusing to pay for it, while he was suffering in his old age; and observed to Boyce, that he, Richardson, knew Boyce could borrow the money. Boyce said he could not, without making sacrifices, which he was unwilling to do for the purpose of paying a debt not then legally due. Richardson urged Boyce’s promise, to pay before hand if the money should be wanted, to which Boyce replied, that he would do so if he knew where to borrow the money. Richardson named the defendant Kennedy as one from whom the money could he borrowed. Boyce then conversed with Stephen Richardson, (who at (hat time resided with Kennedy.) upon the probability of borrowing the money of him; and said Stephen (who seemed anxious that his father should get the money,) stated to Boyce, that there was but little doubt of getting the money from Kennedy. Boycé then stated to them, that if they, or either of them, would make an arrangement with Kennedy for the money, and he would advance it, that he, Boyce, would take back the draft on Hunt, and execute his note to Kennedy payable in the ensuing April. Thereupon, said Stephen started to Kennedy’s, and returned with him to (he house of Boyce on the 2d or 3d ofNov. 1814. Daniel Richardson remaining all the time $t Boyce’s. The circumstances attending, the counting of the money,as stated- *75 fey Boyce, do not differ materially, if at all, from the account given of the transaction by Kennedy. Boyce •says, after the,money was counted D Richardson gave. up the draft on Hunt, and thereupon he, Boyce, executed his note to Kennedy for $-, payable the ensuing April, “which note was for the full amount of the balance due from this defendant to the defendant D. Richardson, and, thereupon, this defendant left the money lying on the table, and went out to order horses for the purpose of riding to Harrodsburg, and when he so went out, he believes the defendant Richardson was in the act of putting up the money.” Boyce says, he never saw the money afterwards, and don’t know who carried it away from his house; but hath been informed that Kennedy, at the request of Richardson, took possession .of the money to carry' it home for the use of D. Richardson, as they lived in the Same county. Boyce states, that when he gave the draft, that a calculation was then madeofthe principal and interest then due, and interest was calculated on the principal sum up to the 1st of April, 1815, the note which D. Richardson held on Boyce being due on the said 1st of April, 1815, and the draft was given for the sum so produced by the addition of interest and principal, “consequently, this defendant was not bound to pay interest on the note given to Kennedy, before the 1st of April, 1815, and for that reason the note to Kennedy did not bear interest from the date; and if there was any arrangement relative to interest, it was made by Kennedy and the Richardsons, and he did not know any thing of it.”' Boyce says, that'at the time he so paid D. Richardson, his conduct was fair, honest, and correct, and without any intention, on his part, to defraud the complainant; but that he did then suspect, that it was'the object of Richardson to get the money out ofhis hands, to prevent its being attached, stayed,orinjoined by the complainant,and such, his suspicions, have been confirmed by subsequent events. He admits, in this answer, that he had heard, before making the payment, that the complainant had filed a bill against Daniel and Stephen Richardson, and one Voris and himself, for the purpose of subjecting the lands, which Daniel Richardson had originally got of the complainant, to the satisfaction of his demand; and he thinks this information was given to him by *76 John L. Bridges. “He afterwards heard of the pen-dency of such a suit from several persons; but this de; fondant had never seen the bill.before the payment the money, nor had any subpoena or other process been served upon him.” Boyce admits, that in the spring or summer after he gave his note to Kennedy, he objected to paying it; because, some time after he had paid the money to Richardson, he was informed of the allegations of the complainant’s bill in detail; and because he had also heard it insinuated, that Kennedy had taken charge of the money,and had not,pr would not, pay it over to D. Richardson, and that there was some combination between the Richardsons and Kennedy in relation thereto. To satisfy himself in relation to these matters, he wrote to D. Richardson by a special messenger, and received for answer, that Kennedy had paid over the whole of the money; whereupon he filed., his original,answer, without stating any of the transactions with Kennedy. ' Boyce’s original answer was filed in June, 1815. Thereafter, according to the answer to the supplement, Boyce again refused to pay the note which he had executed to Kennedy, and justifies his conduct upon the ground, that D. Richardson told him Kennedy would not pay over all the money. He speaks of a gift of a bag of flour and ten dollars to D. Richardson, to enable him to live, and his intention (o communicate to the complainant the fact, that Kennedy would not pay the money to Richardson, so that complainant might enjoin it in Kennedy’s hands, &c.
Daniel Richardson’s answer admits the judgment, imprisonment,&c.; and that bne inducement in selling the six negroes, to his son-in-law Boyce, was, the pro1 handily that the complainant would obtain the unjusl judgment against him, which he afterwards did obtain. The answerj in connexion with the proof, places it beyond all doubt that the sale of the slaves by D. Richardson, was made by him with the intent to defraud Poague, the creditor.
It is in proof, that Daniel Richardson avowed his determination that Poague should never get any thing, staling that “he had nothing, it was all Stephen’s”, After this, D. Richardson expressed his uneasiness and fear, that his sou Stephen would spend all tho *77 proparty and negroes, and took counsel of the witness, who told him, that he thought D. Richardson ought to fix his negroes in such a way, that he and his old lady should have a support in their old age. The witness states, that in a conversation with Boyce it was mentioned, either by him or Boyce, that something ought to be done for the old people, D. Richardson and wife, as Stephen would spend all the property; when Boyce said he would buy the negroes; at a fair ,price, and pay them honorably ; that accordingly D. Richardson sold the negroes to Boy (e, at the valuation of Dunn and the witness, at $>1,800. That on the day of sale the old lady wa.s crying about the situation1 she was placed in, when Boyce told her not to be uneasy, that he would let her have Saul and Hanna for her use during life, and a place to live in; that if the negroes were not sold to him, that either Stephen would spend them, or that it was probable that Robert Poague would get them with his suit then in court. The witness is asked, Did you not hear Capt. Boyce promise, to try and fix the negroes so that the old people should not suffer, and to act upon honor in the business? The witness answered, “He told me he would be upon honor hound to pay them for the negroes, and give them a place to live on, as above. The witness, in response to a question put by Boyce, says, that it was his impression, that what Boyce said about Sfeplien spending the property, or Poague’s takingit, was merely done to papifv the old lady. The foregoing is the only testimony directly bearing upon the sale of the. slaves, and the contract, between Boyce and Richardson. There are other depositions filed. It seems, from a receipt agreed to be used as evidence, that Boyce paid Kennedy, on the 4th of September, 1816, the debt due on the note executed to him, which then amounted to $2,066 61. .
We have been thus particular in detailing the statements of the answers and the proof, because if is only upon Ihe inferences to be drawn from (hem, establishing a participation on the part of Boyce in (he fraud of D. Richardson, that a decree can with propriety be rendered against him. The answers undertake to detail a variety of transactions with great minuteness and particularity, thereby evincing the intention to he extremely accurate; if, therefore, *78 when the various statements made are compared and examined, it shall be found that there are many dis- and some matters whioh'do not comport with the ordinary modes of business, they will furnish grounds on which the conclusion may rest, that the conduct of the defendants is justly subject to the imputation of attempting to defraud the complainant. Boyce-, in his first answer, speaks of paying D. Richardson upwards of $>1,600, the sum not precisely recollected. In his second answer, he admits he payed him $ — —, the amount of his note to Kennedy, which is charged in the supplement to be $1978, and which must be taken as confessed. From the first answer every one wmuld suppose, that Boyce paid his own money; that he kept no account of it; that he had forgotten the precise amount, but that it exceeded $1,600. No one would ever have supposed that he had paid $1,978; that he bad borrowed the money, and given his note for it, which had not been paid when his answer was filed; and, consequently, that he had the means of answering precisely how much he had paid, by referring to his outstanding note in Kennedy’s hands. Yet all this is manifest from his second answer. His stating, in the first answer, tbat he did not recollect the amount paid, is, as shown by second answer, the same thing, as though he had stated he did not recollet the amount borrowed from Kennedy, and could not come nigher the sum than to say something upwards of $1,600. No one from such language, would suppose that the true sum was $ 1,978. The first answer wasfiledin June, 1815. The note to Kennedy was due in April, 1815. The second answer assigns reasons, why he would not pay the note in the spring and summer of 181.5; from all which it appears, that while Kennedy was dunning for a note of $1,978, in the spring and summer of 1815, Boyce in June 1815, could not speak with more precision as to its amount, than to say, upwards of $1,600! the borrowing was only the preceding fall!
The first answer of Boyce makes the time of purchasing the slaves in January, 1812; anote at three years from that date, which he states was the credit allowed, would bring the payment to January 1815; whereas it appears, by the second answer, that the payment, for the negroes,, was. not due to Richardson gntil April, 1815.,
*79 According io the first answer, BoyCe “ had not the toost distant expectation that Poague would ever recover a judgment.” To old Mrs. Richardson he whentabout to purchase, “ thrit it was probable Robert Poague would gel them, with his suit then in the court,” and “that Stephen would spend them if they were not sold to him.” But this was done to pacify the old lady. Be it so. The more truth there was in the statement, the more likely to reconcile the mother-in-law to the sale of the negroes to the son-in-law, especially as he was to “be upon honor bound to pay for the negroes, and to give them (the father-in-law and mother-in-law,) a place to live on.” The event proved, that Boyce was right in his statement to the old lady, and wrong in his answer. Besides, the very fact relied on by Boyce, to show that Poague could never succeed, rather in our minds operates against his conclusion. For if Poague, after being twice unsuccessful in the circuit court, had, by new trials or reversals in this court, still brought his cause of action to bear upon the defendant, unaffected by the decisions previously rendered, it stood in all its original force, and showed that it was not easily defeated. Daniel Richardson, who best knew the,nature of Poague’s claim, long acknowledged the dan-, ger he apprehended from it, and it would be a little singular that his fears were not imparted to his son-in-law Boyce. They were, according to the proof.
According to Boyce’s first answer, D. Richardson “became exceeding needful of most of the necessaries of life, exhausted the interest on the bond before it was due,” &c. and Boyce, it would seem, through mere commiseration for his poverty, made him “ many advances in money and other articles.” Notwithstanding, all this, in Nov. 1814, about five months before the nóte for $1,800 was due to Richardson, he receives $1,978 in cash. It thus appears, that Richardson had not even exhausted the interest as fast as it was payable. What then becomes of Boyce’s ‘'•many advances” made before any thing was due!
But Richardson becomes so very troublesome that Boyce draws the draft upon Hunt. The nature of this draft we know not, because it is not exhibited. If it was a bill of exchange, Richardson, by his negli *80 gence, may have lost all recourse on Boyce. As he and Boyce, according to the second answer, were not friendly, so far as Richardson’s abuse could produce hostility, and as Richardson had a friend near Hunt, as he said, who could transact the business, if seems to be a little strange, under all the circumstances, that he did not forward the draft. His conduct, at least, showed that there was not much foundation for his clamor about wanting money. But it is not so important to notice the conduct of Richardson as that of Boyce. He states, that in June 1814, he gave the draft and took in his note. The idea conveyed by his first answer is, that at the time the draft was given, he and Richardson then settled, and ascertained the amount then due, and for which the draft was given. But in the second answer, it is alleged that interest was calculated up to April, 1815, and the interest so calculated constituted a part of the amount for which the draft was drawn. Now, it must be recollected that the draft on Hunt was drawn payable at a few days after sight-, and, from what Boyce states, it was done in good faith, and he had a right to calculate on its payment. Is it not then singular, that interest on $1,800 from June till April, say $90, should be putin the draff, when the parties must have believed, if they had acted in good faith, that Richardson would have got the money on the draft long before April. Paying interest on money after it has been paid, is a strange thing! The transaction presents itself to us in that aspect. For, unless Richardson calculated on getting the money before April from Hunt, there was no perceivable motive, unless some trick was intended, to induce him to accept the draft. But why should Boyce state, in his second answer, that the interest •was thus included ? He assigns the reason for it. He paid no interest on the money borrowed from Kennedy until April, and, to account for that circumstance,he runs into what we think must he regarded as a great absurdity, the danger, if not the certainty, of paying interest on his debt after he had discharged it to the last cent. ■ Kennedy, in his answer, also undertakes to account for hisgeffingnointerest from Boyce. He doubtless thought it would seem strange, that he should lend so large a sum, for about five months, without interest; for the proof shows, that he was in the ha- *81 Mi offending money-for the usurious premium of frorti •12 to 18 per cent. Kennedy gave Bo)ce the use of the money without interest, because of the intimate friendship subsisting between them, and his-gratitude "for the “present of some stock of a favorite-breed, the -valufe bf which Kennedy thought equivalent to the interest'.”" So Kennedy’s first answer states; but when, in his second answer, he becomes more specific, the '“stock of a favorite breed” turns out to be'“a pair of Calcutta hogs, usually estimated and sold for $10.” The difference between the $10, and the interest on ,$1,978 for five months, is balanced by gratitude and ■friendship; and these, according to Boyce, vanish in 381<5;' Kennedy then wanting his money, or 1-2 per cent, usury, and Boyce refusing to pay, and applying Ao his attorney at one tjme, to inform Poague of the combination between Kennedy and Richardson to defraud him! •
Boyce, in his first answer, holds out'the idea that he paid the debt in Nov.. 1814, to get clear of his indigent and restless fath.er-in-laW, and to prevent incur-ríñg his lasting displeasure. But all this, as he avows in his second answeF, could not induce him to'make any sacrifices to-get the money. It had no other efi feet, than to induce Boyce to agree, that-if D. Richardson and his son Stephen could get any one to advance the money, he, Boyce, would execute to the lenderlfis note for the amount, payable in April following,. R amounts to this: that in order to get clear -¿f the old man’s clamor and abuse, Boyce would pay the debt to another, at the same time he was bound to pay D. Richardson, provided he was puf to n,o trouble in making the arrangement. . We do not perceive, in the avowals contained in .the second answer, any evidence of that dread of the father-in-law’s “lasting displeasure,” which is declared to be a motive of action in the first answer.
By Boyce’s second answer, i t is apparent that Kennedy took home the money with him, and kept it for months. According to the receipt filed,’ it was not paid until the 3lst of August, 181-5; thus remaining with Kennedy about ten months.- Boyce makes Kennedy’s holding the money, .a pretext for refusing to pay his note. N-ow, take the fact already adverted *82 to, that Boyce did not, in his “many advances,” eveft pay the interest due on his note, in addition, remem ber that D. Richardson did not, according to a fair construction of Boyce’s first answer, make any application for payment to Boyce, after he got the order or draft on Hunt in June, until on or about the 1st, 2d, or 3d of November, when he again applied, and whea he got the money; and then recollect, that he only handed it over to Kennedy, and what becomes of the pressing necessities, which D. Richardson pretended to have, for the use of money? They vanish; and from the knowledge which Boyce discloses in his answers, it seems to us that he knew, that D. Richardson was only pretending to be distressed for money. Indeed there can be no doubt of it; for Boyce says, in his second answer, that, although his conduct wa6 fair, when he paid Richardson, he did then suspect it was his object to get the money, to prevent its being attached, áte. by Poague. How does this suspicion, entertained at the time, comport with the averment of his honest indignation at the fraudulent conduct of Kennedy and Richardson, about which he was so incensed, that he wanted to withdraw his answer to amend it, for the purpose of detailing their conduct, and about which at one time he intended to apply to his attorney, to write to Poague? The whole affair is seen through and explained, when Boyce tells us, he would not answer until he had sent a special messenger, to learn whether Kennedy had paid over the money to Richardson, and that he would not pay his note until Kennedy paid Richardson; and when plained it means this, that is was not immoral, in the estimation ofBoyce, to pay Richardson before the debt was due, to enable Richardson to escape the effects of an attachment in favor of Poague; but that it would be very wrong for Kennedy to withhold the money from Richardson: and that it would be better for Poague to get it, than for Kennedy to keep it. • No other ii> ference can be drawn, from this and all the preceding facts and circumstances, but that Boyce throughout the whole transaction, from the commencement of his purchase, intended to aid and assist his father-in-law, to secure the negroes from liability to satisfy the claim of Poague. We will mention a few things more. It js proved by Smith, that when he demanded payment *83 «/the note executed by Boyce to Kennedy, Boyce refused least he should again have to pay Poague. It Is proved by Jennings, that D. Richardson, as far bark-as 1808 or 8, told him that he had made over his property to one of his sons, to evade the payment of Poague’s debt. The declaration, which Boyce made to Mrs. Richardson, that “Stephen would spend the negroes,” is a clear intimation that Stephen Richardson, son of Daniel, had it in his power to do so. Hé must have derived that power under his father; for if his father had made no transfer to him, Stephen could not spend the property. To prevent this, and likewise to defeat Poague, a sale to Boyce was suggested as the remedy, he stipulating to pay honorably, and to furnish the old people with a home. We think the conclusion, from all the foregoing, is irresistible, that Boyce wasparticeps eriminis in D. Richardson’s efforts to place his property beyond the reach of his creditor Poague. The consequences of this conclusion must be pointed out.
A contact, ^tenTtp fraud a erify, tor, is uttejjjp <he mand ofaerS di tor is purely, maent execution thereon,returned no estate found,be-. fore he can wn'tohav'e fraudulent i: ide.
*83 Under the statute of frauds, the contract between Boyce and his father-in-law, in relation to the six slaves, that contract having been made with the intent to delay and defraud Poague in the collection of his claim, is utterly void. It results, that the negroqs are liable to the payment of Poague’s judgment.
It is contended, however, by the defendant in er- *or, that the court had no jurisdiction, because it doe| Rot appear that Poague had sued execution upon hisi; Judgment, and procured its return. That such is the fule we admit, see Halbert, &c. vs. Grant, IV Mon. 581, and we do not intend to run counter to it. By. prosecuting execution the judgment may be satisfied;, without resorting to a court of chancery for aid. As there is ho reason for applying to the chancellor where the common law remedy is adequate, the suing.execu-lion and procuring its return is required, to show the failure of the common law remedy. Now, we think the allegations of the bill, which must be taken for confessed, are very ample to show that the complainant has come within the spirit, if not the very.letter, of the rule. He sued out a ea.sa.and, in virtue of it, committed 0. Richardson to jail, who broke jail, and Áadc his escape without paying the debt. As chan* *84 cellars, we will'no.t require mord to>enti(Ie a party'ip our extraordinary; aid.' T.he rule does not require evefy possible exertion, by using the process allowed by courts of law, before applying.to the chancellor for-aid. .
where a cred-t£dned°°d5 mént a m.sa. and1 in virtue of iy, debtor to jail8 and the or has broken ids'escape^6 without ing the debt, Biav^nthoul suíñgout other executivepro_ ^bii/to'set*111 side fraudulent convey-debtor^tt>e oerty.3f)ro"
ckoses in action of are-oanbe ed, only, by pursuing the ifreAe't of’2i, fctJigfest, 505!
<.■ Payment for SSvvío* fecquired ft under % oon-lotWeeatim witti an intent to defraud the creditor» of vendor,will legitimate the contract, nor rescue the the^^of* the creditors.
*84 ft is contended that the cases of Buford vs. Buford. I Bibb, 305, McFerran vs. Jones, II Litt. 222, and Crozier vs. Young, III Mon. 157, show that no relief should granted in this case. The two first prove that, ré-no^e vX{'eu'ted hy B°Jce to D. Richardson 'i8 a chose in action, it cannot be reached except under the provisions of the act of 1821,1 Digest, 505., application of' the case of Crazier vs. Ybung is perceived, so as to benefit the defendants in err.or. So far, therefore,, as the bill attempts to reach ¿he note for $i,800,executed by Boyfce to Richardson, ^,e complainant could not- succeed. It is admitted, the principal struggle on both sides, with tlie parties, related to this note, and so far they have been ^ 'awn off from the real controversy. We' have fol-them, and examined their conducl.ih regard to .that note, because it furnished grounds for inference, wheref)y we were the better enabled to discover the true-nature of the whole transaction, and-the intent of ¿he parties from the beginning. Bu.t these cases which show, *hat chose in action could not be reached at the time.this bill was filed,do not atall militate against reaching the - property which has beén fraudulently conve)'e<^ to defeat creditors. The case of Crazier vs. Young shows it. As the bill prays for-general relief, we think the chancellor should have subjected (-^e six slaves in Boyce’s hands, to the payment, of judgment, by causing Boyce to surrender them, and if they were not surrendered, then to causfe h¡m ¿0 account ¡fortheir value, according to the principles settled in the case, of Halbert vs. Grant, IV Mon. 580.
The payment of the note executed ..to Kennedy-by Boyc.e, cannot legitimate the contract made bhtwefen Boyce,and Richardson relative to the sla.ves. If it could, the statute Of frauds would be a..dead letter, If Boyce sustái ns a loss, in cansefiue-nce:of the payment to K'enne<Jy» >¡ is his own fault;,first, in attempting, to his father-in-law,. by covering, the. propefty.;'.and *85 secondly,-in shifting his liability to'Kennedy, under circumstances which indure the belief that it was a mere device, to enable him to answer the bill of complainant, by stating that the debt was paid by him to Richardson. .
Daviess, for plaintiff; Wicklijfe, Wooley, and Cunningham, for defendants.
. The decree is reversed with costs, and the cause remanded for proceedings not inconsistent with, this . . r ~ opinion.
Note. — Chief Justice Robertson did not sit in this case.